IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

PACIFIC BELL TELEPHONE COMPANY, d/b/a AT&T CALIFORNIA, a California corporation,

Plaintiff,

v.

THE CALIFORNIA PUBLIC UTILITIES COMMISSION, *et al.*,

Defendants.

No. C 07-1797 SI

**ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT**

On November 16, 2007, the Court heard argument on the parties' cross-motions for summary judgment. The Court GRANTS in part and DENIES in part the motion filed by AT&T, and GRANTS in part and DENIES in part the motion filed by the CPUC defendants. As explained below, the Court holds that the CPUC exceeded its jurisdiction when it set rates for the UNE-P after March 11, 2006, and that the CPUC misapplied the FCC's DS1 transport rule. The Court also concludes that the CPUC's notice and grandfathering rules violate the filed-tariff doctrine. However, the Court holds that the CPUC properly ruled that CLECs are entitled to access ILECs' entrance facilities at TELRIC rates when needed for interconnection.

**BACKGROUND**

**1. Regulatory framework/Telco Act of 1996**

The Telecommunications Act of 1996 ("Telco Act" or the "Act"), 47 U.S.C. § 251 *et seq.*, seeks to promote competition in the nation's telecommunications system by opening up traditionally

monopolistic local exchange networks to new competitors. Prior to the Act's passage, local telephone services were provided by local exchange carriers who were usually issued exclusive geographic franchises by state licensing authorities. Each incumbent local exchange carrier ("ILEC") operated its own local telephone network.

Relevant here, Section 251 of the Act imposes three specific requirements on incumbents to foster competition: (1) interconnection – incumbents must allow competitive local exchange carriers ("CLECs") to interconnect with the incumbents' local exchange networks at fair, nondiscriminatory rates; (2) lease of unbundled network elements ("UNEs")[1] – incumbents must allow competitors to lease parts of the incumbents' networks at fair, nondiscriminatory rates; and (3) resale – incumbents must allow competitors to purchase telephone services at wholesale rates for resale to the competitors' customers. The rates that ILECs may charge for access to UNEs must be based on "cost," 47 U.S.C. § 252(d)(1), and the FCC has implemented this "cost" standard by requiring state commissions to adopt the Total Element Long-Run Incremental Cost ("TELRIC") methodology, a ratesetting methodology that sets rates attractive to CLECs.

Section 252 of the Act sets forth the "Procedures for Negotiation, Arbitration, and Approval of Agreements" that parties must follow when a competing carrier wishes to enter the local telecommunications market. Pursuant to this section, if a competing carrier so requests, an incumbent must enter into negotiations to arrive at an interconnection agreement under which the competitor is provided access to the incumbent's network and services. If parties are unable to agree on the terms of an interconnection agreement, the parties are required to submit to mediation and/or compulsory arbitration. When parties submit to compulsory arbitration, as the parties in this case did, the state Public Utility Commissions ("PUCs") are charged with resolving "any open issues and imposing

---

[1] "Unbundled" refers to one of three ways that a CLEC can acquire access to incumbent carriers' facilities. When passing the 1996 Act, Congress established three paths of entry for CLECs seeking to compete with incumbent carriers in the local market. A CLEC can (i) construct and deploy its own facilities and then "interconnect" them with the incumbent's network so that customers of the two carriers can call each other, 47 U.S.C. § 251(c)(2); (ii) purchase the incumbent's finished retail services at a large discount and then resell them to its own customers, *id*. at § 251(c)(4); or (iii) lease qualifying elements of the incumbent's network on an "unbundled" basis (i.e., as a stand-alone offering rather than as part of a complete service) and then use those elements, in combination with other facilities, to provide a finished service, *id*. at § 251(c)(3).

conditions upon the parties to the agreement . . . that meet the requirements of section 251 . . . including the regulations prescribed by the Commission pursuant to section 251 . . . ." 47 U.S.C. § 252(c)(1). The state PUCs must approve all interconnection agreements in order for the agreements to be effective. When reviewing arbitrated agreements, the state PUCs are instructed to ensure that the agreement complies with section 251 and the FCC regulations promulgated thereunder. Section 252(e)(6) further provides that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the agreement . . . meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6).

## 2. *TRRO*

On February 4, 2005, the FCC released the *Triennial Review Remand Order* ("*TRRO*"), Order on Remand, *Unbundled Access to Network Elements; Review of the Section 251 Unbundling Obligations of Incumbent Local Exchange Carriers*, 20 F.C.C.R. 2533 (2005), *aff'd*, *Covad Communications Co. v. FCC*, 450 F.3d 528 (D.C. Cir. 2006). The *TRRO* is relevant here in three respects. First, the *TRRO* imposed a "nationwide bar" on unbundled access to the "UNE-Platform," or "UNE-P," which consists of all the loop, switching and transport facilities necessary to provide local telephone service, in pre-combined form. The FCC explained,

> We reexamine incumbent LECs' obligations to unbundle mass market local circuit switching in light of the D.C. Circuit's vacatur of our previous rules.[2] In particular, we have revised our approach to impairment pursuant to *USTA II*'s instruction to draw appropriate inferences about potential competition in one market from evidence of competitive deployment in another market. Applying the court's guidance to the record before us, we impose no section 251 unbundling requirement for mass market local circuit switching nationwide. We conclude, based on the record here, and the reasonable inferences we draw from it, that competitive LECs not only have deployed a significant, growing number of their own switches, often using new, more efficient technologies such as packet switches, but also that they are able to use those switches to serve the mass market in many areas, and that similar deployment is possible in other geographic

---

[2] On three occasions from 1996 through 2003, the FCC issued orders that imposed what the Supreme Court has termed "blanket" unbundling. *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. 366, 389-90 (1999). These orders required ILECs to allow CLECs access, at TELRIC rates, to the UNE-P. Each time the FCC imposed the blanket unbundling requirement, the FCC orders were vacated as inconsistent with the 1996 Act. *See Iowa Utils Bd.*, 525 U.S. at 388-91; *U.S. Telecom Ass'n v. FCC* ("*USTA*"), 290 F.3d 415 (D.C. Cir. 2002); *U.S. Telecom Ass'n v. FCC* ("*USTA II*"), 359 F.3d 554 (D.C. Cir. 2004).

3

> markets. . . . We find that these factors substantially mitigate the Triennial Review Order's stated concerns about circuit switching impairment. Moreover, regardless of any limited potential impairment requesting carriers may still face, we find that the continued availability of unbundled mass market switching would impose significant costs in the form of decreased investment incentives, and therefore we conclude not to unbundle pursuant to section 251(d)(2)'s "at a minimum" authority. Finally, we adopt a transition plan that requires competitive LECs to submit orders to convert their UNE-P customers to alternative arrangements within twelve months of the effective date of this order. This transition period shall apply only to the embedded customer base, and does not permit competitive LECs to add new customers using unbundled access to local circuit switching. During the twelve-month transition period, which does not supersede any alternative arrangements that carriers voluntarily have negotiated on a commercial basis, competitive LECs will continue to have access to UNE-P priced at TELRIC plus one dollar until the incumbent LEC successfully migrates those UNE-P customers to the competitive LECs' switches or to alternative access arrangements negotiated by the carriers.

*TRRO*, Mass Market Local Circuit Switching, Summary, ¶ 199.

Second, the *TRRO* held that CLECs may not obtain unbundled access to "entrance facilities," which are dedicated transport facilities that connect CLEC switches to the ILEC's network. The FCC found that CLECs were not impaired in their ability to compete without unbundled access to these facilities because "entrance facilities are less costly to build, are more widely available from alternative providers, and have greater revenue potential than dedicated transport between incumbent LEC central offices," and because "competitive LECs are increasingly relying on competitively provided entrance facilities." *Id*. ¶¶ 138-39. The FCC also noted, however, that "our finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to Section 252(c)(2) for the transmission and routing of telephone and exchange access service. Thus, competitive LECs will have access to these facilities at cost-based rates to the extent that they require them to interconnect with the incumbent LEC's network." *Id*. ¶ 140.

Third, the *TRRO* discussed a limitation on the number of lower capacity DS1[3] transport circuits a CLEC can obtain as UNEs. The *TRRO* states,

> *Limitation on DS1 Transport*. On routes for which we determine that there is no unbundling obligation for DS3 transport, but for which impairment exists for DS1 transport, we limit the number of DS1 transport circuits that each carrier may obtain on that route to 10 circuits. This is consistent with the pricing efficiencies of aggregating

---

[3] DS1 and DS3 transport circuits are transport facilities dedicated to a particular carrier for transmission between ILEC wire centers. A DS1 has 24 "channels" and therefore can carry 24 calls simultaneously, while a DS3 has 28 times that capacity. *See Local Competition Order*, 11 F.C.C.R. 15499 (Aug. 8, 1996) (hereafter "*TRO*" ¶ 202 n. 633-34).

4

**United States District Court**
For the Northern District of California

      traffic. While a DS3 circuit is capable of carrying 28 uncompressed DS1 channels, the record reveals that it is efficient for a carrier to aggregate traffic at approximately 10 DS1s. When a carrier aggregates sufficient traffic on DS1 facilities such that it effectively could use a DS3 facility, we find that our DS3 impairment conclusions should apply.

*Id*. ¶ 128 (footnote omitted). After this order, the FCC issued a rule limiting to 10 the number of DS1 transport facilities that CLECs may obtain on any transport route: "A requesting telecommunications carrier may obtain a maximum of 10 unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis." 47 C.F.R. § 51.319(e)(2)(ii)(B) (effective March 11, 2005). Thus, the FCC rule applies the 10 DS1 facility limitation more broadly than had the TRRO, and one of the issues here is the apparent discrepancy between the *TRRO* and the FCC rule.

### 3. CPUC rulings

After the *TRRO*, AT&T sought to negotiate changes to its existing interconnection agreements, but AT&T was unable to reach agreement with all CLECs. AT&T initiated a consolidated arbitration that would result in an amendment incorporating the FCC's new rules. The PUC issued its original decision on January 26, 2006, and an order granting limited rehearing on January 11, 2007. AT&T challenges four of the CPUC's rulings: (1) the CPUC set a discounted retail rate – the "Total Service Retail" or "TSR" rate[4] – rather than "market" rates, for UNE-P lines that did not transition to alternative serving arrangements by the FCC-mandated March 11, 2006 deadline; (2) the CPUC required AT&T to provide CLECs with access to entrance facilities for interconnection at TELRIC rates; (3) the CPUC confined the FCC's 10-circuit limit on the number of DS1 transport circuits a CLEC can obtain as UNEs to routes where higher-capacity DS3 circuits are not available as UNEs; and (4) the CPUC required AT&T to provide 60-days notice of certain proposed changes in its federal and state access tariffs, and required AT&T to grandfather state special access tariff offerings under certain circumstances.[5]

---

[4] According to the CPUC, the TSR is set at 17% less than AT&T's retail rates. RE 2400-01.

[5] AT&T appears to have abandoned its challenge to the CPUC's ruling requiring AT&T to waive nonrecurring charges for post-deadline UNE transitions involving no physical work.

5

**STANDARD OF REVIEW**

This Court considers *de novo* whether the CPUC's rulings are in compliance with the Telco Act and the implementing regulations, and considers all other issues under an arbitrary and capricious standard. *See U.S. West Communications v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1117 (9th Cir. 1999).

**DISCUSSION**

**1. Rate for UNEP-lines**

The CPUC ruled that UNE-P lines that had not transitioned to "alternative serving arrangements" by the March 11, 2006 deadline should be re-priced to "Total Service Resale" rates. Before the CPUC, AT&T argued that it should be allowed to charge "market-based" rates after the March 11, 2006 deadline. The CPUC adopted the TSR rates, which had previously been approved by the Commission, because "adopting SBC's market based rates would be unduly punitive for failure to make the deadline to transition services from ULS/UNE-P arrangements." RE 1921. On rehearing, the CPUC reaffirmed its decision,

> We are persuaded that the rate for CLECs unable to complete the submission of transition orders by the deadline should be at TSR rates. To adopt market rates without an evidentiary record would violate Public Utilities Code Section 1705, which requires separately stated findings of fact and conclusions of law on all issues material to the decision. Without a record, the Commission would have no basis for finding that the rates are "just and reasonable," as required by Public Utilities Code Section 451 and § 201(b) of the Communications Act of 1934. In contrast, the TSR rates were established after a broad rulemaking and investigation that included hearings.

RE 2400. AT&T contends that the CPUC exceeded its authority when it set rates for UNE-P lines because, after *TRRO*, UNE-P lines were no longer required to be unbundled under Section 251.

As an initial matter, the CPUC suggests that AT&T waived its right to challenge the CPUC's authority because AT&T and the CLECs submitted the matter of what rate should apply to UNE-P lines as an "open issue" in arbitration. The CPUC argues that AT&T is trying to "have it both ways" by first submitting the matter to arbitration and now challenging the CPUC's jurisdiction. The Court disagrees. The CPUC does not cite any authority for the proposition that a party can waive the jurisdictional arguments raised by AT&T. Moreover, although AT&T did not frame its jurisdictional arguments as directly in the proceedings below, AT&T did assert that the matter was beyond the CPUC's authority,

6

*see* RE 2000 (AT&T's brief on rehearing); RE 2016 n.11 (AT&T comments on draft ALJ decision), and repeatedly argued that market rates should apply to UNE-P lines after March 11, 2006, because after that date UNE-P lines were no longer governed by Section 251, *see* RE 1370 (AT&T's initial brief to arbitrator). Accordingly, the Court finds that AT&T is not foreclosed from arguing that the CPUC acted beyond its authority in establishing rates for UNE-P lines after those lines were no longer subject to the unbundling requirements of Section 251.

Turning to the merits of AT&T's arguments, AT&T contends that the CPUC exceeded its authority in setting rates for UNE-P lines after March 11, 2006 because the PUC's authority to resolve "open issues" is confined to matters that arise "pursuant to Section 251." 27 U.S.C. § 252(a)(1), (b)(1). Section 252 of the Telco Act authorizes the CPUC to resolve "open issues" that remain after the parties negotiate "a request for interconnection, services or network elements *pursuant to Section 251*." 47 U.S.C. § 252(a)(1), (b)(1) (emphasis added). Section 252 further provides that state commissions must "ensure that such resolution . . . meet[s] the requirements of Section 251 of this title, including the regulations prescribed by the [FCC] pursuant to section 251 of this title." *Id*. § 252(c)(1). AT&T argues that the CPUC is only authorized to set rates "for purposes of" Section 251, and that as a result of the *TRRO*, UNE-P was no longer available pursuant to Section 251.

The CPUC does not address AT&T's statutory arguments. Instead, the CPUC generally asserts that it acted consistently with the Telco Act because the TSR rate is a just and reasonable rate intended to foster competition. The CPUC contends that because there is no true telecommunications market, there is no true "market rate" for UNE-P lines, and if AT&T were permitted to charge a "market rate," such a rate would be "whatever AT&T wants to charge," and would be unduly punitive and anti-competitive. The CPUC notes that other state commissions have applied a resale rate (similar to the TSR) to un-transitioned UNE-P arrangements or ordered conversion of such lines to the equivalent resold services. The CPUC also argues that the FCC simply failed to address what would happen after the March 11, 2006 deadline, and that the *TRRO*'s silence on the issue does not mean that the state commissions have no authority to act with regard to un-transitioned UNE-P arrangements after March 11, 2006.

The Court concludes that the CPUC exceeded its authority by establishing rates for UNE-P after

7

the March 11, 2006 deadline set by the FCC. Whether the rate the CPUC selected is just and reasonable is irrelevant to the analysis of whether the CPUC had the authority to set the rate in the first place. There is no dispute that the *TRRO* required CLECs to transition their base of embedded UNE-P lines to alternative arrangements by March 11, 2006, and that after that date ILECs were no longer required to provide UNE-P on an unbundled basis. In the *TRRO*, the FCC emphasized that the 12 month transition period was intended to provide CLECs sufficient time to fully transition the embedded base of UNE-P customers:

> *Because unbundled local circuit switching will no longer be made available pursuant to section 251(c)(3)*, we establish a transition plan to migrate the embedded base of unbundled local circuit switching used to serve mass market customers to an alternative service arrangement. In particular, eliminating unbundled access to incumbent LEC switching on a flash cut basis could substantially disrupt service to millions of mass market customers, as well as the business plans of competitors.
>
> We require competitive LECs to submit the necessary orders to convert their mass market customers to an alternative service arrangement within twelve months of the effective date of this Order. This transition period shall apply only to the embedded customer base, and does not permit competitive LECs to add new UNE-P arrangements using unbundled access to local circuit switching pursuant to section 251(c)(3) except as otherwise specified in this Order. The transition we adopt is based on the incumbent LECs' asserted ability to convert the embedded base of UNE-P customers to UNE-L on a timely basis while continuing to meet hot cut demand for new UNE-L customers. We believe it is appropriate to adopt a longer, twelve-month, transition period than was proposed in the Interim Order and NPRM. We believe that the twelve-month period provides adequate time for both competitive LECs and incumbent LECs to perform the tasks necessary to an orderly transition, which could include deploying competitive infrastructure, negotiating alternative access arrangements, and performing loop cut overs or other conversions. Consequently, carriers have twelve months from the effective date of this Order to modify their interconnection agreements, including completing any change of law processes. *By the end of the twelve month period, requesting carriers must transition the affected mass market local circuit switching UNEs to alternative facilities or arrangements.*

*TRRO*, ¶¶ 226-27 (emphasis added, footnotes omitted).

As the above language makes clear, the FCC established a transition period during which CLECs would transition their embedded UNE-P customers, and after which ILECs would no longer be required to provide UNE-P on an unbundled basis. The FCC repeatedly emphasized that it was imposing a "nationwide bar" on mandatory access to the UNE-P under Section 251. Because ILECs were not required under Section 251 to provide access to the UNE-P after March 11, 2006, the CPUC did not have authority to set rates for the UNE-P after that date. *See Southwestern Bell Tel. L.P. v. Missouri Pub. Serv. Comm'n*, 461 F. Supp. 2d 1055, 1068-69 (E.D. Mo. 2006) (rejecting state commission

8

argument that it had authority to set rates under Section 271 of Act, and holding that "the statute limits state commission arbitration and rate-setting authority to items required under § 251."); *cf. Qwest Corp. v. Public Utils. Comm'n of Ohio*, 479 F.3d 1184, 1197 (10th Cir. 2007) ("However, the state commissions cannot create a duty to provide services not required by the statute, so their arbitration power cannot extend beyond the four corners of § 251.").

The CPUC asserts that absent continued rate regulation, CLECs would have no ability to get access to the equipment and facilities they need to provide service to their customers. This contention ignores the FCC's findings in the *TRRO* that "competitive LECs not only have deployed a significant growing number of their own switches, often using new, more efficient technologies such as packet switches, but also that they are able to use those switches to serve the mass market in many areas, and that similar deployment is possible in other geographic markets." *TRRO* ¶ 199. To the extent the CPUC asserts that CLECs would be at the mercy of ILECs' anticompetitive pricing, and that CLECs would be without a remedy, the Court disagrees and finds that the appropriate remedy in that case would be to seek relief at the FCC, which has jurisdiction to enforce Sections 201 and 215 of the Telco Act.

### 2. Access to entrance facilities[6]

The CPUC ruled that although the *TRRO* held that entrance facilities[7] are no longer a UNE under Section 251(c)(3), CLECs are entitled to receive entrance facilities at TELRIC rates for purposes of interconnection under Section 251(c)(2). The CPUC rejected AT&T's argument that Section 251(c)(2) only allows CLECs to interconnect the CLEC's *own* facilities to the incumbent's network, and does not require the ILEC to provide any facilities. In reaching its ruling, the CPUC relied on the following passage from the *TRRO*:

> We note in addition that our finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2) for the transmission and routing of telephone exchange service and

---

[6] The parties agree that the CPUC applied its ruling on entrance facilities to facilities running not only between ILEC and CLEC networks, but also between CLEC networks and AT&T's "SS7" signaling network, and that the Court's resolution of this issue applies to both CPUC rulings.

[7] An entrance facility is a form of dedicated transport that provides a transmission path between the networks of an ILEC and a CLEC.

9

>    exchange access service. Thus, competitive LECs will have access to these facilities at cost-based rates to the extent that they require them to interconnect with the incumbent LEC's network.

*TRRO* ¶ 140. The CPUC stated in its order, "[c]learly, the FCC established that interconnection would include the facilities used to effect that interconnection, and those facilities encompass more than just the crossconnects described by SBC. The FCC is also clear that interconnection, like UNEs, should be priced at TELRIC." RE 1959.

AT&T argues that the FCC's statement in Paragraph 140 does not itself actually impose an obligation to make any facilities, much less entrance facilities, available pursuant to Section 251(c)(2). AT&T argues that the FCC was merely observing that its ruling on entrance facilities "does not alter" a pre-existing right to obtain "interconnection" facilities. AT&T contends that nothing in the FCC's prior rules or orders specifically requires ILECs to provide entrance facilities pursuant to Section 251(c)(2). AT&T also argues that unlike the unbundled access requirement set out in Section 251(c)(3), Section 251(c)(2) does not contemplate the provision of any ILEC facilities to CLECs. AT&T notes that Section 251(c)(2) imposes a duty to provide interconnection "*for* the facilities and equipment *of [the] requesting telecommunications carrier*." 47 U.S.C. § 251(c)(2) (emphasis added). AT&T contends that the CPUC's requirement – that AT&T provide the actual facility that the CLEC uses to connect its network to AT&T's – goes well beyond this limited mandate.

The Court is not persuaded by AT&T's arguments, and finds that the CPUC did not violate the *TRRO* when it required AT&T to provide CLECs with its entrance facilities as needed for interconnection. AT&T's interpretation of the *TRRO* would render Paragraph 140 meaningless; if AT&T were correct, there was no need for the FCC to discuss CLECs' right to obtain interconnection facilities within the context of entrance facilities. The Court finds it significant that the FCC was careful to emphasize that "our finding of non-impairment with respect to entrance facilities does not alter the right of competitive LECs to obtain interconnection facilities pursuant to section 251(c)(2) for the transmission and routing of telephone exchange service and exchange access service." *TRRO* ¶ 140. The Court agrees with the CPUC that this distinction is logical based on the two different uses to which entrance facilities are put: (1) when used by a CLEC as a transmission path to carry traffic to and from its end users on the CLEC's own network ("backhauling"); and (2) when used as a transmission path

10

providing a link between ILEC and CLEC switches for the exchange of traffic between the two networks ("interconnection"). The Court also rejects AT&T's contention that the *TRRO* does not require that ILECs lease the interconnection facilities themselves to CLECs. The FCC has interpreted "interconnection" to mean "the physical linking of two networks for the mutual exchange of traffic." *TRO* ¶ 176.

The Court's decision is consistent with the holdings of two other federal courts that have addressed this issue. In *Southwestern Bell Telephone L.P.*, 461 F. Supp. 2d 1055 (E.D. Mo. 2006), the court held that the state commission properly required ILECs to make entrance facilities available for interconnection under Section 251(c)(2). *Id*. at 1071-73. The court noted that "carriers can use entrance (transmission) facilities for at least two distinct purposes" – backhauling and interconnection – and that only the former was precluded by the *TRRO*. *Id*. at 1071-72. In *Illinois Bell Telephone Company v. Box*, 2007 WL 2815924 (N.D. Ill. Sept. 21, 2007), the court reached the same conclusion. *Id*. at *7-8. The court rejected the argument – advanced by AT&T here – that requiring ILECs to make entrance facilities available for interconnection was tantamount to imposing an unlawful unbundling duty under another name. "The Arbitration Decision does not require AT&T to lease entrance facilities as UNEs for the full range of uses permitted by section 251(c)(3) – nor could it given the FCC's determination that CLECs are not entitled to entrance facilities as UNEs under that subsection. Instead, the Arbitration Decision requires AT&T to make entrance facilities available for the sole purpose of interconnection under section 251(c)(2)." *Id*. at *6.

### 3. Transport rule

AT&T challenges the CPUC's interpretation of an FCC rule limiting the availability of DS1 transport circuits where DS1 transport is available as a UNE. The FCC rule states,

> **Cap on unbundled DS1 transport circuits.** A requesting telecommunications carrier may obtain a maximum of ten unbundled DS1 dedicated transport circuits on each route where DS1 dedicated transport is available on an unbundled basis.

47 C.F.R. § 51.319(e)(2)(ii)(B). Relying on language from the *TRRO*, the CPUC held that the 10 DS1 cap does not apply to transport routes where DS3 transport is also available as a UNE. RE 1923-25. Under the CPUC's ruling, CLECs can order an unlimited number of DS1s as long as DS3 transport is

11

available as a UNE. The CPUC cited Paragraph 128 of the *TRRO*, which states, "[o]n routes for which we determine that there is no unbundling obligation for DS3 transport, but for which impairment exists for DS1 transport, we limit the number of DS1 transport circuits that each carrier may obtain on that route to 10 circuits."

AT&T contends that the CPUC's ruling is contradicted by the plain text of the FCC rule, and should be reversed on that basis alone. The CPUC acknowledges that the limitation it imposed is not contained in the language of the FCC rule. However, the CPUC argues its holding simply effectuates the FCC's intention – as stated in the *TRRO* – to cap the number of unbundled DS1 transport circuits only on transport routes where DS3 is not available as a UNE. AT&T attempts to reconcile the FCC rule with the *TRRO* by arguing that the *TRRO* never states that the DS1 cap applies *only* to routes with no unbundling obligation for DS3 transport. AT&T argues that Paragraph 128 of the *TRRO* "is instead intended to emphasize and clarify that a limit of 10 DS1 dedicated transport circuits *also* applies to those routes where unbundled DS1 dedicated transport is available and DS3 unbundled transport is not."

One other court has addressed the apparent discrepancy between the FCC's rule and the *TRRO*, and held that the FCC rule is controlling. In *Cbeyond Communications of Texas, L.P. v. The Public Utility Comm'n of Texas*, 2006 U.S. Dist. LEXIS 7381 (W.D. Tex. Jan. 24, 2006), the state commission adopted the cap on DS1 transport circuits as stated in the FCC rule, and rejected the CLECs' arguments that the cap should be limited based on the *TRRO*. The court upheld the state commission's interpretation. The court first rejected both sides' efforts to reconcile the FCC rule and Paragraph 128 of the *TRRO*, finding instead that the "plain text of the two sentences at issue is facially irreconcilable." *Id*. at *11. The court found that the FCC rule "is stated in general terms, and there is no language on which one could reasonably base a conclusion that any exceptions were intended." *Id*. at *12-13. The court also rejected the CLECs' reliance on *Verizon Communications, Inc. v. FCC*, 535 U.S. 467 (2002), to argue that the limitation from the *TRRO* should be imported into the rule. "[T]he high court was faced [in *Verizon*] with assigning meaning to an ambiguous term left undefined by the regulations. . . . *Verizon* did not stand, however, for the much different proposition that an underlying agency order can be read not to interpret, but to *change* the meaning of a regulation's text." *Id*. at *14 (emphasis in original).

12

The Court agrees with the reasoning of *Cbeyond*, and holds that the plain language of the FCC rule, which includes no exceptions to the 10 DS1 transport circuit cap, is controlling. This Court is unpersuaded by the parties' attempts to reconcile the language of the FCC rule and the *TRRO*; the FCC rule broadly states that the cap applies "on each route where DS1 dedicated transport is available on an unbundled basis," while the *TRRO* states "[o]n routes *for which we determine that there is no unbundling obligation for DS3 transport*, but for which an impairment exists for DS1 transport, we limit the number of DS1 transport circuits . . . ." *TRRO* ¶ 128 (emphasis added). To harmonize the FCC rule and Paragraph 128 requires ignoring the plain language of both.

The CPUC contends, as the CLECs did in *Cbeyond*, that the FCC's rule must be read in conjunction with the *TRRO*. However, none of the cases cited by the CPUC stand for the proposition that an FCC order can void clear and conflicting language of an FCC rule. *See Verizon*, 535 U.S. at 535-38 (looking to FCC order to illuminate regulation on "technical feasibility"); *SBC Inc. v. FCC*, 414 F.3d 486, 499-500 (3d Cir. 2005) (recognizing general proposition that FCC order and regulation should be read together, but finding no inconsistency between two); *MCIMetro Access Transmission Servs. v. Bellsouth Telecomms. Inc.*, 352 F.3d 872, 883 (4th Cir. 2003) (rejecting state commission's limitation based on FCC order in face of "otherwise unambiguous rule").

### 4. Notice and grandfathering provisions

The CPUC required AT&T to provide at least 60 days notice before it changes the availability of a product in AT&T's federal and state access tariffs if a CLEC is using the affected service as part of a commingled arrangement.[8] The CPUC also required AT&T to grandfather the access services in its California tariff in the event that loss of those services would affect a CLEC's commingling arrangement. RE 1946-47.

The CPUC asserts that both the notification and grandfathering provisions give CLECs time to find and transition to alternatives to the ILEC's tariffed service, without disruption to customers or unnecessary expense. The CPUC provides the following example:

---

[8] In a commingled arrangement, the CLEC combines a UNE and a tariffed service, and cannot provide service to its customers without both elements.

> For example, a CLEC might buy dedicated transport from an ILEC's special access tariff and use that transport to move telecommunications traffic between its and the ILEC's switch and then on to a residence via the ILEC's loop. If the ILEC restricts the availability of the dedicated transport service, the CLEC would be unable to move traffic between switches and thus unable to serve its customers. The CLEC could either lay its own cable for transport or buy a similar service from a competitive access provider (which, in turn, interconnects with the ILEC's switch), but neither option realistically can be implemented in a 7 or 15 day window. Without notification of future tariff changes, CLECs will be unable to acquire substitute equipment and facilities and maintain service to their customers.

Cross-motion at 18-19.

AT&T raises a number of challenges to the CPUC's notice and grandfathering provisions. Most persuasively, AT&T contends that these provisions violate the filed-tariff doctrine. The filed-tariff doctrine bars one customer from receiving services under a tariff on terms that are different from those applied to other customers of the same tariff. *See generally Evanns v. AT&T Corp.*, 229 F.3d 837, 840 (9th Cir. 2000). AT&T argues that under the notice and grandfathering requirements, not all carriers that purchase AT&T's tariffed services will be treated equally. Instead, AT&T contends, the tariff customers who commingle the services they purchase from AT&T's tariffs with UNEs will receive favorable treatment in comparison to tariff customers who do not commingle, by obtaining advance notice of alterations to the tariffs, and by obtaining continued access to tariffed terms after those terms have become unavailable to other carriers.

The CPUC argues that the notice requirements do not affect any federal or state tariffs, and thus the filed-tariff doctrine is inapplicable. However, as the Supreme Court has held, the filed-tariff doctrine applies to more than rates and ratesetting:

> Rates, however, do not exist in isolation. They have meaning only when one knows the services to which they are attached. Any claim for excessive rates can be couched as a claim for inadequate services and vice versa. "If 'discrimination in charges' does not include non-price features, then the carrier could defeat the broad purpose of the statute by the simple expedient of providing an additional benefit at no additional charge. . . . An unreasonable 'discrimination in charges,' that is, can come in the form of a lower price for an equivalent service or in the form of an enhanced service for an equivalent price." *Competitive Telecommunications Assn. v. FCC*, 998 F.2d 1058, 1062 (C.A.D.C. 1993). The Communications Act recognizes this when it requires the filed tariff to show not only "charges," but also "the classifications, practices, and regulations affecting such charges," 47 U.S.C. § 203(a); and when it makes it unlawful to "extend to any person any privileges or facilities in such communication, or employ or enforce any classifications, regulations, or practices affecting such charges" except those set forth in the tariff, § 203(c).

*American Tel. & Tel. Co. v. Central Office Tel. Inc.*, 524 U.S. 214, 223-24 (1998). The Court noted

that "discriminatory 'privileges' come in many guises," such as expedited shipping or expedited processing of orders. *Id*. at 224-25. Here, under the notice and grandfathering provisions, CLECs that use access service as part of a commingled arrangement would receive preferential treatment in comparison to CLECs that purchase the same service from the same tariff, but do not use that service in a commingled arrangement. *See* Indiana Order, 2006 Ind. PUC LEXIS 40, at *189 ("The CLECs' proposals regarding notice and early termination are also unlawful under the filed-rate doctrine, because they would force SBC Indiana to provide the CLECs that enter into the Agreement with more favorable terms and conditions than those accorded to other carriers and special access customers in the state, whose service will continue to be governed by the FCC's and Commission's rules.").

The CPUC contends that even if the filed-tariff doctrine applies, it does not bar the notice and grandfathering provisions because CLECs that use access services as part of a commingled arrangement are not "similarly situated" to other CLECs. The CPUC does not cite any authority holding that customers of the same tariff are not similarly situated, and the cases cited by the CPUC are inapposite. *See General Motors Corp. v. Tracy*, 519 U.S. 278, 298 (1997) (holding tax exemption for regulated natural gas utilities not discriminatory under Commerce Clause because utilities and independent marketers serving different markets are not similarly situated); *Global Naps, Inc. v. Verizon New England, Inc.*, 327 F. Supp. 2d 290, 301 (D. Vt. 2004) (holding prohibition on offering service did not violate filed-tariff doctrine because "[t]he ban does not have the effect of discriminating, or requiring Global to discriminate, among Global's customers; it simply does not permit Global to offer the service to any of its customers.").

*///*

**CONCLUSION**

For the foregoing reasons and for good cause shown, the Court hereby GRANTS in part and DENIES in part plaintiff's motion for summary judgment (Docket No. 27) and GRANTS in part and DENIES in part defendant's motion for summary judgment. (Docket No. 30).

**IT IS SO ORDERED.**

Dated: February 21, 2008

SUSAN ILLSTON
United States District Judge